Good morning everyone. Before we begin, Judge Berzon and I wish to thank Judge Ezra, the district court for the District of Hawaii. Thank you for coming and helping us with our busy docket. We appreciate it. Thank you very much and I'd like to thank my law clerks for taking on the extra work too. Yes, all of our law clerks deserve a lot of thanks. Yeah. We also have one case submitted on the briefs at this time, Banhosa Hospitality v. Hiscox, and with that we'll hear the cases in the order they appear on the docket, beginning with Molina-Pena v. Barr. Good morning, Your Honors. Robert Powell on behalf of the petitioner Juan Molina. In this case, Mr. Molina has lived in the United States since he was about three months old. And he's lived here, he's been in the United States continuously, except for one time when he was deported from the United States. He was out of the United States for a couple months in 1997. The order of deportation was in May of 1996. There are a couple things I think we can agree on with the government in this particular case. This case involves a question about whether that prior deportation, which occurred when Mr. Molina was a permanent resident, whether that prior deportation in May of 1996 was lawful, or whether the Board of Immigration Appeals is required to follow the district court's finding in the 1326 prosecution. The question more precisely is whether it was lawful at the time it was issued. Yes, whether it was lawful at the time. That's right. That question arises in two different cases in two different contexts. After he re-entered into the United States, Mr. Molina was put in removal proceedings in 2012. And in those removal proceedings, he brought a collateral attack and argued that the prior deportation in May of 1996 was unlawful. The question also arises in the context of his motion to reopen. He filed a motion to reopen, which the Board of Immigration Appeals denied. And the question there, in that motion to reopen, is whether that deportation in May of 1996 was unlawful. Counsel, I want to ask you about the preclusion issue, because that really seems to me to be at the heart of your arguments, that we have, that the BIA in one or both of these contexts had to be bound by what the district court had said. And in 2012, both the IJ and the BIA said that the issues in the district court proceeding and in the immigration proceeding were not identical. Do you agree that identical issue is one of the requirements for preclusion to apply, for You didn't answer my question. Is that a requirement that the issues be identical for issue preclusion to apply? So that's a yes or no question. Is that a requirement of issue preclusion? Yes, that the issues be identical, that is required. Okay. So in what respect, in your view, did in 2012, when the BIA and what was wrong with their analysis with respect to that point? Okay. So yeah, the issues, the standard is maybe a little bit different in the two contexts, but the issues, the issues that are relevant here that are identical in both. How are the standards different? I thought it's the difference between fairness and exceptional circumstances. Is that the difference? So in both the cases, the standard that the board uses is gross miscarriage of justice. But that's not relevant to my question. My question is whether the issues in the two proceedings are identical. And that question was answered in detail in 2012. And so I'm pointing to that and saying, what error, if any, did they make in analyzing the identicalness, if that's a word, of the issues? So the issues that are identical in both are the ones resolved in the district court proceeding in the 1326 charge. Those are, in order to dismiss the case, Mr. Molina had the burden of proving, first, that he exhausted any available administrative remedies. Second, that he was improperly deprived of the opportunity for judicial review. And third, that there was a violation of due process. And fourth, that he was prejudiced by that violation. Now, the violation of due process in his particular case involved the fact that he was eligible for 212C relief, but he was not granted an opportunity to apply for that relief. What effect, if any, does it have on our analysis that this was not a litigated issue, which also is normally a requirement for issue preclusion? No, those issues were all concessioned by the government or a stipulation by the government in the 1326 proceeding in district court regarding eligibility for 212. The, well, the government didn't, I'm not sure whether the government actually agreed to that or not, but it didn't put up much of a fight on the issue of eligibility. It may well be that the government, so Mr. Molina had the burden of proof this was a contested issue. That's, that's my question, whether it actually was litigated. That is also a requirement of, for issue preclusion to apply. Right. That it be actually litigated and not just stipulated by a party. The, what's, what's litigated is the case. The issues, you know, the, the government may agree on a particular issue. But issue preclusion is about issues. And so if the issue that you want us, or to say the agency had to accept wasn't litigated, why would issue preclusion apply? The, well, the, there was briefing that was done. Mr. Molina argued that he met his burden of proof on the four issues. The government responded and it, and submitted a brief. This is in the record. And then the court was called on to make a decision. Can I ask a question? The, the board and the IJA, when they discussed the issue preclusion, my recollection, and you can tell me if I'm wrong, was that they didn't, neither of them suggested there was any problem about whether the, there was, the issues were litigated. Their view was that there were different standards. And they cited some cases having to do with beyond a reasonable doubt convictions. But really, that has nothing to do with this, because this was not about a conviction beyond a reasonable doubt. It was about a proceeding in which the Petitioner did have the burden of proof. And, and as to the standard, I mean, I, I assume in both cases it's a predominance in terms of facts. So that standard is the same. So is there anything in, in the, the, so what the, are we reviewing anything on the collateral estoppel issue other than what the board did? No, I mean, the, the issue on collateral estoppel, I think, the reason why it applies is because, well, the, the board is relying on old case law. The reason the collateral estoppel applies here is precisely because Mr. Molina had the burden to prove those four elements. It's not so much old case law, it's just old case law about something else. Yeah, the, it's old, well, the matter of Paris, the case that the board relies on, is old case law that applied before AEDPA put the burden of proof on Mr. Molina, on the, on the defendant to prove those four elements. The, where those four elements are, have to be resolved in the case with, and, and the court accepts those and makes a finding, the case. Can I ask something else? One of the elements on collateral estoppel is that he didn't have an opportunity to appeal. And you keep mentioning in your brief, and I can't tell whether it's a separate issue on the merits as well as collateral estoppel, that he, you say he never actually got the document that told him he had an opportunity to appeal. The government keeps saying yes, but in the record, there's a document that shows that he was told he could appeal, and you're sort of passing the night on that. Do you have a separate due process argument on the fact that he didn't have the opportunity to appeal originally, aside from the collateral estoppel question? I, I think there, there are two, two things. You know, one is the finding that, that this court had to make in order to dismiss. But second, the record reflects that the, this was a mail-out order of deportation. It was not an order in court where the judge says you have the right to appeal. It was a mail-out order. It was actually not, it was addressed to Mr. Molina while he was in jail, but care of another person. There's no evidence that it was actually delivered to him, and the, the order itself, in the order, the representative was named as somebody other than Mr. Molina. Counsel, where in your opening brief to this court did you argue, if you did, that the failure to personally receive the notice was a separate due process violation? The... Give me a page number. I'm sorry, I'm not able to do that right offhand where that was... Well, I didn't see it. That's why I'm asking you. I didn't see a separate argument to that effect anywhere in your opening brief. Okay, yeah, the, I'm sure we did point out in the briefing that Mr. Molina did not receive... You did mention that, but there's no argument premised on that. I understood your brief to say that the BIA's analysis was wrong, but I didn't read it to say that the BIA failed to examine that specific issue or examined that specific issue in an improper way. The reason the court's, the board's decision was wrong on this is even under their own standard, the gross miscarriage of justice standard, the way the board interprets that is whether the the order of deportation would have withstood judicial review at the time that the decision was issued. I think the answer to that is clearly that it would not have withstood judicial review at the time. If Mr. Molina had been advised and if he had been able to take an appeal, that the, this court would have found that the immigration judge's judicial review, and that's exactly the defining, the holding in Magana, Magana Pizano. Magana Pizano looked at, actually in a very similar timeline, I think in Magana Pizano, the individual filed an appeal about the same time Mr. Molina would have filed an appeal. The case goes up to the Ninth Circuit and this, this circuit looks at it and says that AEDPA, the amendments in AEDPA do not apply to deportation proceedings, cases that began before AEDPA was enacted, before April 24th, 1996. Another thing that I was concerned about along the same lines, i.e. did the board, well two other things that I'm not sure the board decided. The board has never actually, the board itself has never actually dealt with the Magana problem because it's been continually calling this a St. Cyr problem. Right, which is a mistake on the board's part. This is not a St. Cyr problem, this is a Magana issue. And they're different because he was in proceedings at the time of AEDPA. Correct, he was in proceedings before AEDPA was enacted. And St. Cyr addressed a broader group of people, not that subgroup, and Magana deals with that subgroup. That's right. That's right. And were you clear in, when you went to the board, either time, that you were talking Magana and not St. Cyr? Yes, Magana was cited, I can't immediately point to the, to the record, but Magana is cited in at least a couple times in the, in the briefing that was done to the, to the board. Now along the same lines, i.e. what they didn't decide, but this time I think you're not last time, to see what standard they were applying on the sua sponte, essentially. And their, their enunciated standard is something like exceptional circumstances or, and, but the standard they applied the first time and the second time was this, what's the language? Gross miscarriage of justice. But you're not complaining about that. I mean, you, I mean, I, I assume gross misconduct, a gross miscarriage of justice is a tougher standard or a sub, than except, exceptional circumstances. It may be. Our argument is even accepting the board's standard, gross miscarriage of justice, that's misapplied in this case. What the board means by gross miscarriage of justice is whether the, the decision, whether the deportation order could have withstood judicial review at the time it was entered. And, and again, that's it, this, in this case, the judge's order could not have withstood judicial scrutiny at the time it was issued. Or executed, according to them. Or, or executed, that's right. And when was, when was he actually deported? About a year, July 1997, about a year later. All right, so. So you, yeah, whether you look at May of 1996, when the order was issued, or July of 1997, when he was deported, in either case, it would not have withstood judicial review at that time. It was also a short time when the board itself was applying, not applying it paratroactively to a subgroup. Yes, and I think, matter of. He doesn't quite fit it, maybe, because he hadn't actually filed his application, although he said he was going to file an application. Yes, there was a period of time when the board, in a case called matter of Soriano, I believe, where the board said the AEDPA amendments would not be applied retroactively to people who had relied on the relief. Which Mr. Moline, I think, clearly did in the proceeding. You know, there's the letter to the immigration judge explaining what he's trying to do to ensure that he should be allowed to live in the United States. I had one other question. Oh, yes. You have two cases, right? One of them is the motion to reopen, and the other is this collateral attack, but I don't understand how you get back at the collateral estoppel question in the second case, when it was already decided in the first one. Well, the matter, like we think, in the second, in the removal proceedings, in the this case is on all, is the same situation as matter of Farinas. Farinas, very similar, person who was deported from the United States when, at the time, the deportation order couldn't have withstood judicial review. But whatever it is, they had already decided your exact collateral estoppel issue in the first place, in the matter of, in the reopening case, right? Yes, in the reopening, you mean the board. So I don't understand. I mean, it seems to me that they can simply say we already decided this, which is what they said. So how can we get at it in the second case? Don't we have to get it out in the first case? I'm calling the first case the reopening case. Yeah, well, in the first case, that was, that issue was left open. The first case is the one that was remanded back. How was it left open? I understand it's before us in the first case, but in terms of the board having to reach it in the second case, they didn't. Well, what they said is we rely on the argument that we made previously. But why can't they do that? What, why? Why can't they do that? Well, they can do that. That's fine. But then, I mean, you know, if we want to attack that argument, the petitioner, of course, has the right to make the argument that the board made a mistake in its rationale for why they denied to, you know, why they said. In the reopening case. But in the second case, all they're saying is we're not going to do this over again. Right. But, and the reason, you know, and they provide the reasons they're giving are the reasons that they had given in a prior case. So, I mean. But it's a prior case involving the same person. And I mean, it's not like they're just saying some other random. Essentially, preclusion. I don't understand why they didn't use the term, but it's essentially a preclusion issue. Or a law of the case kind of issue. But in the second case, the board says that Mr. Molina is not, was not eligible for 212C relief at the time. And in one context, you, it appears that you're arguing the issue is whether he may apply for 212 relief as opposed to whether he's entitled to reopen.  He's, well, our argument is not that he's entitled to apply for 212C relief. Not, not, I mean, you know, the issue, I guess, ultimately then in front of the immigration judges, whether he should be granted, whether he's entitled to the relief. But the question here is whether he's entitled to apply for 212C relief. In other words, getting back to what both Judge Graber and Judge Berzan were suggesting, the question is whether there's some kind of a preclusion. Whether the collateral estoppel argument applies. Yes. That's one. Back to the same place, right? Right. In both, yeah, I mean, the issue in both the cases, the issue is the same one, whether or not. That's exactly what Judge Berzan was saying. I think I understand. Counsel, you've exceeded your time. We've asked a lot of questions, so you may have a minute for rebuttal when the time comes. Thank you. Thank you. May it please the Court, Jennifer Corey on behalf of the Attorney General. I'll just go ahead and address the, what was litigated before the district court. Let me ask you one question, though, that came to my mind listening to Judge Berzan's questions. And that is whether there was error in the board's 2018 proceedings, at least. I haven't gone back to the earlier one. By failing to deal with the Magana-Pisano issue, which was raised in the petitioner's brief to the board starting at page 71 of the administrative record. And it goes on for about three pages. And the board didn't appear to come to grips with that. What's your response to that? Well, I don't, I guess I don't believe the board cited Magana-Pisano. No, they didn't. Otherwise, he said he argues St. Cyr, and they went on with St. Cyr, and they never, which is different. It is different. It is, but I think that the board was applying the fact. I mean, Magana-Pisano held that AEDPA doesn't apply retroactively, right, the AEDPA amendment. And that's what the board did. The board dealt with that issue. I'm sorry. It held that it did apply retroactively to the group of people who were already in proceedings based on the statutory language. Magana-Pisano? Yes, it did. Oh, my gosh. You think it didn't? I thought, maybe I got that completely wrong. I thought Magana-Pisano meant that AEDPA could not, oh, that the new amendment couldn't apply to people who were already in proceedings. It did not apply retroactively to that group of people. Right, exactly. Okay, sorry. Maybe I misstated that. And the board, in both cases, I believe, was dealing with St. Cyr and not with that. In this case, this is the, I'm reading now from the 2018 opinion. In this case, the respondent claims there's a basis in law. Specifically, he argues that he's entitled to benefit from material changes in the law effectuated by INS versus St. Cyr. But that isn't what he was arguing. I believe you're right. St. Cyr dealt with IRERA. I think the board, though, was giving credence to the argument, just cited the wrong case, I believe. Well, but it doesn't really analyze the fact that he was in proceedings. It doesn't talk about that at all. Well, but they do, the board did recognize that the law changed and that afterwards he would have been eligible for 212C. Yes, but the argument. I'm sorry, Judge Pisano. Go ahead. Pisano was decided by this court not particularly long after, in 1999. Right. If you look at the usual time frame of an immigration case, if he had appealed, which he didn't, but he says there are reasons he didn't, which is he wasn't told he could, he might well have been in the group of people who benefited from Magano-Pisano, right? Correct. And St. Cyr was a couple years later and was a much more extensive group and was not, as I recall, based on the language of the statute. This was a, the Magano-Pisano argument was an interpretation of the statute. It wasn't about the suspension clause or about any sort of big constitutional stuff. Right. But applying, even if it got the case wrong, the board was saying that even if it, sorry, didn't name the exact correct case that was applicable, the board did acknowledge at least the holding of Magano-Pisano. And the fact that Mr. Molina- No, it doesn't say that. Where does it say that? It never says that he's entitled because he was in proceedings, which is his argument. His argument is specifically not St. Cyr. I mean, that's an alternative. He says EDPA does not apply to Mr. Molina-Pena's deportation proceeding because it was pending before the Seattle Immigration Court at the time of the enactment, and then there's a long discussion of Magano. And that argument seems to me not dealt with. Well, but the board is saying that, yes, it acknowledges there was a change in law that then made him at three years after the fact or two years after the fact eligible for 212C. But he didn't even apply. He didn't file a motion to reopen for 16 years after that law changed. So the law in Magano-Pisano, that was 1999, right? I mean, they did acknowledge- Do you disagree that the question on gross miscarriage of justice, either in the reopening context or in the collateral attack context, is what rights he would have had at the time of the original proceeding or the execution, right? Correct. And for that purpose, might it not matter which rule he was relying on? I don't believe so because the order was entered- I'm sorry. I know when the order was entered. And Magano-Pisano came out in 1999, correct? And he was deported- They were both subsequent. Right. He was deported in 1997. Correct. So- During the execution. If I understand your argument correctly, it is regardless of how the arguments of the petitioner were characterized by the board, its actual holding was that in 1996, when the order was entered, in 1997, when it was executed, it was a correct holding and a correct execution at those times regardless. Yes, that is my argument. But, well, Magano-Pisano seemed like a fairly ordinary construction of a statute, which, I mean, to call it new law is not the way our legal system works. I mean, it said essentially this is what the statute always meant. I mean, St. Cyr was more of a tour de force, and I understand to regard that as a somewhat unpredictable result makes sense. But the notion that the question, when this court first got the issue, first got the issue, right? We said this is not, this is what this statute means and meant. It's not, we're not changing the law. We're simply saying what it was all along. Yes, and I think that's petitioner's argument. Right. I understand that the statute clearly did not apply retroactively at the time, but that issue was litigated in almost all of the circuits. Right, and it came out the same way in all the circuits. It came out the same way in all the circuits, actually. It did, it did, but at the time it didn't. That's some indication that it always meant that. Well, I think it was, even the Attorney General reversed herself, right? In matter Soriano was decided twice, right? Right. And I don't think that it was, I think when it came out, it, INS at the time reasonably interpreted it to apply to people in proceedings at that time. And it was decided later, but it wasn't, there's nothing, it wasn't clear. It was something that had to be litigated. What about my concern, well, what about the cloud law stop motion? Go ahead. I mean, I do find the board's explanation for why there isn't cloud law stop completely opaque and non-applicable. I mean, they're citing these cases saying there's a different standard, but why is there a different standard? Now, the burden was on him, and the issues are essentially the same, including this issue of whether he had an opportunity to appeal, which the district court had to find he didn't in order to reach the result that it did. It was, that's a finding, I mean, just by itself, that is an issue that was decided by the district court. It had to be to reach its conclusion. And that, my understanding is, was certainly not conceded by the government. No. What was conceded by the government is the AUSA found that he was statutorily eligible for 212C and stipulated to that. Stipulated or just said it in his brief? Said it in his brief, and in the district court's orders says both parties agree the defendant was statutorily eligible for 212C relief when he appeared for his deportation hearing. And did the district court say you agree with that? They just cited that it was stipulated. Well, that's not stipulated. There's a difference between writing a brief that says they say this and we agree it's true and stipulating, but go ahead. They just said both parties agreed, right? But what happened was that the AUSA applied, in his analysis, applied AEDPA before the amendment. So he analyzed Mr. Molina's statutory eligibility for 212C with the five years imprisonment term. Not that he was just an aggravated felon, but that he needed five years of imprisonment, which he would have been eligible under. So that's not what the immigration judge applied, right? The immigration judge applied AEDPA after the amendment, which took away the five years imprisonment. Then the AUSA went on to say, but we find that Mr. Molina would not be prejudiced anyway because of his crimes, and that it would have been denied as a matter of discretion in any case. And that's what the district court decided. They found that he was prejudiced. And that was all that was litigated before the district court. Excuse me? But you're all applying the same standard that would be applied in the immigration court, right? What is the different standard? The only thing the board said about why there's no collateral stop was that it was a different standard. What's the different standard? I think it's fundamentally unfair in district court and gross miscarriage of justice. Okay, and the difference is? Because our case law is and was, at the time the district court decided it, that essentially the same with regard to it's not fundamentally unfair if at the time it was he was deported, later law doesn't matter. So it's the same standard underneath it, right? Right. It's the same. I mean, I can say what the standard is in the administrative proceedings and gross miscarriage of justice meant that it had to be valid at the time that it was executed. And that is the same standard that we apply in this court, and therefore I assume the district court in this circuit applied it, to a criminal case, right? Yes. All right. So what is the difference in the standard? The issue of 212C was not litigated. The issue of 212C eligibility. Did the board say that? Did the board ever mention that in its opinions about Clara Ostopel? No. No. But also the issue of notice was never litigated in this case. The issue of notice? Like opportunity to appeal. That was never raised in his motion to reopen before the immigration judge. And it's not raised here either as a separate argument. It's not raised here either. But what's the difference? I mean, either it has to be preclusive or it isn't because it isn't here. But the district court found it. So if he, right? The district court had to find it to come to its result. Could you tell me what the difference is? All right. Here's a short question. What is the different standard, or how did the board come to the conclusion that there was a different standard applicable in the district court proceedings that is now applicable and, therefore, there was no collateral stop? Because that's what it said, citing a case that's not applicable. So what is the different standard? I mean, the board said it was fundamentally unfair versus gross miscarriage of justice. But we now know that they're both the same, which is because, in fact, the standard in this court with regard to fundamentally unfair is it has to be at the time. Well, it just seems that based on this court's precedent in Avila and Alvarenga, that was, again, what happened. The district court dismissed an indictment on 1326, and the court found that it couldn't be collaterally attacked. Why? Because it wasn't true at the time. Right. So it's the same standard. But if we agree that it's the same standard and they couldn't be collaterally attacked in those cases, it can't be collaterally attacked in this case. Well, whatever. I don't know what the district court found, but whatever it found, it had to be applying the same standard. I don't know what exactly happened in the district court. I know what applies in administrative proceedings. And the fact that this was found in a criminal proceeding, I don't believe can collaterally stop the board from saying that the deportation order was valid. Why not? Sixteen years when it was— Tell me why not. Because of finality as well, too. Because he was ordered deported. He did not appeal that decision. He did not appeal it. And he never argued that he didn't have notice. Oh, yes, he did. He used to argue that from day one. He didn't argue in his motion to reopen. Yes, he did. He mentioned it. The question is whether he based an argument on it. He mentioned it on his appeal to the board, and he said one or two lines that said he had no—he did not— Have adequate notice. He did not knowingly or intelligently waive his right to appeal because the immigration judge did not tell him of his right to appeal. But that—he doesn't explain why. And then it's only before this court that he says he didn't get notice. That's the first time he ever raised that. And the notice was sent to the same address every other notice was sent to, and he was ordered deported in May 1996, and he wasn't deported until July. But on that issue, there's definitely issue of preclusion because the district court had to find that. He said he found it, and he had to find it. Well, I don't think that the board analyzed the notice issue because that wasn't brought up to them. It was brought up to them as part of the collateral estoppel all the way through. In any event, I'm just having problems, serious problems, with the collateral estoppel question. Also, you said in your brief that the collateral estoppel issue isn't before us in the 2018, but that's wrong. I can see that. Okay. Yes. Thank you, counsel. You've exceeded your time, and we understand, I think, your position. You have one minute for rebuttal. Thank you, Your Honor. I would just point out on the issue about the lengthy delay, 16 years or so, the case that's on point is the matter of freeness. Very same situation. The person was ordered, deported, and deported at a time when the order of deportation would not have withstood judicial scrutiny. He was out of the United States for 16 years, came back into the United States, and in deportation proceedings in the second deportations brought a collateral attack on the prior order 16 years earlier. The Board of Immigration Appeals adopted the gross miscarriage of justice standard, said that that order, when it was executed, would not have withstood judicial scrutiny, not administrative scrutiny, but judicial scrutiny, and gave him a 212C. We recognize that he's maintained, because the deportation was improper, gross miscarriage of justice, he maintained permanent resident status. He was granted 212C relief and allowed to continue as a permanent resident. So matter of freeness I think is exactly on point here in this case. Same situation. It's clear that Mr. Molina's order of deportation would not have withstood judicial scrutiny at the time in light of the Magana-Pisano case, and he also should be allowed at least to have the opportunity to apply for 212C relief like it was done in freeness. Thank you. The case just argued is submitted, and we thank both counsel for their arguments.
judges: Graber, Berzon, Ezra